# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**JOHN CARPENTER,**

      Plaintiff,

vs.                             No. CIV 10-671 WJ/LFG

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security**
**Administration,**

      Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

    **THIS MATTER** is before the Court on Plaintiff John Carpenter's ("Carpenter") Motion to Reverse or Remand Administrative Agency Decision, filed March 7, 2011.  [Docs. 16, 17.]  The Commissioner of Social Security ("Commissioner" or "Defendant") issued a final decision denying Carpenter's request for disability insurance benefits ("DIB").  Defendant filed a response [Doc. 18], but despite requesting and receiving an extension to submit briefing [Doc. 15], Carpenter did not file a reply.[2]   Having considered Carpenter's motion and accompanying memorandum, exhibits attached to the motion, the Commissioner's response, the administrative record ["AR"], and the applicable law, the Court recommends that Carpenter's motion be denied for the reasons explained below.

---

[1]**Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.**

[2]Although no certificate of completion of briefing was filed, as is required, the Court considers the matter fully briefed and ready for resolution.

I.    **INTRODUCTION**

Carpenter was born on January 18, 1960 [AR 8, 50], and was 48 years old at the time of the ALJ hearing in 2008. [AR 897.] He is divorced and has lived with his mother in Farmington, New Mexico since 1999. [AR 10, 898.]  Carpenter graduated from high school and received specialized vocational training in his work as a diesel mechanic. [AR 898-899.]

Carpenter last worked in mid-August 2001 when he was employed by Hunsaker Truck Company as a diesel mechanic.  He sustained rotator cuff tears or injuries to both shoulders while at work in August 2001, and eventually had surgeries on both shoulders. [AR 82.] Carpenter's work record indicates he was a diesel mechanic for four different employers from about August 1982 to August 2001. [AR 211.] His earning records show that his annual salaries ranged from around $15,000 to $36,000 in that time frame, although he typically averaged between $20,000 to $25,000 during his 20-year work period. [114-15.]  There are no earnings after 2001. [AR 115.] Carpenter's mother supports him, and they live on her social security payments. [AR 889.]

II.    **PROCEDURAL BACKGROUND**

On April 5, 2006, Carpenter applied for DIB, alleging he was disabled from August 15, 2001, due to "severely crushed right elbow, broken left arm with metal plate, fractured right knee, injuries to both shoulders, neck injury with arthritis, lower back injury with arthritis, previously detached retinas and cataracts." [AR 61, 104, 144.] Carpenter's DIB application was denied both on initial consideration and reconsideration. [AR 61, 62, 96, 104.] On January 8, 2007, Carpenter filed a request for an ALJ hearing [AR 90.]

The parties note that Carpenter filed earlier applications for disability on April 27, 2005, alleging the same onset date of August 15, 2001. [Doc. 18, p. 2, n.1; AR 40, 126, 131.] The Social Security Administration denied those applications at the reconsideration level on September 16,

2005, and Carpenter did not timely request review. [AR 40, 108-09.] Thus, Defendant explains that Carpenter's current disability application is properly adjudicated from September 16, 2005, the date he was last denied benefits, to December 31, 2006, the date Carpenter was last insured for DIB. [Doc. 17, p. 15; Doc. 18, p. 2, n.1, n.2.]

In his opening brief, Carpenter's attorney states that the relevant adjudication period began April 15, 2005, a year prior to his April 15, 2006 application.  Carpenter's counsel mistakenly referred to the application date as April 15, 2006, instead of the correct date of April 5, 2006. [Doc. 17, p. 15.]  In a letter, dated March 26, 2009, from Carpenter's counsel to the Appeals Council, Carpenter amended the onset date of his disability from August 15, 2001 to April 5, 2005. [AR 890.]

Carpenter did not attempt to rebut the Commissioner's argument presented in its response brief, as there was no reply.  Thus, the Court concludes that the relevant adjudicatory period is September 17, 2005, the date Carpenter's earlier benefits applications were denied, to December 31, 2006, the date Carpenter last met the insured status requirements for Title II benefits. [Doc. 18, p. 2, n.3.]

On August 26, 2008, the ALJ held a hearing in Farmington, New Mexico.  Both Carpenter and his prior attorney were present at the 1.5 hour long hearing.[3] [AR 894-96.] Carpenter's orthopedic physician, Dr. Peter M. Saltzman, testified on behalf of Carpenter at the hearing, and a vocational expert also testified.

On August 7, 2008, the ALJ issued an adverse decision after reviewing the testimony of Carpenter, Dr. Saltzman, and the vocational expert, along with all evidence of record.  As of this

---

[3]As of January 29, 2009, the present attorney of record entered an appearance on behalf of Carpenter before the Appeals Council. [AR 35.]

date, the Court observes that Carpenter had not amended his alleged onset date of disability, *i.e.,* August 15, 2001. [AR 42.]

On October 6, 2008, Carpenter requested review of the decision. [AR 36.] In a letter dated March 26, 2009, present counsel for Carpenter thanked the Appeals Council for allowing him an extension to submit additional evidence, along with his arguments. [AR 18.] Counsel included a Medical Assessment of Ability to Do Work-Related Activities (Physical) filled out by Dr. Saltzman, dated March 10, 2009. [AR 20.] On September 23, 2009, counsel again wrote the Appeals Council to submit additional evidence, including a consultative examination performed on September 17, 2009, and related medical assessment forms. [AR 7.] The Appeals Council also considered a letter written by Carpenter's mother, dated February 23, 2009. [AR 5.]

On May 13, 2010, the Appeals Council denied the request for review. [AR 3.] The Appeals Council considered the reasons Carpenter disagreed with the ALJ's decision. In addition, the Appeals Council reviewed the September 17, 2009 consultative examination but observed that the new information pertained to a different time, after the relevant period of adjudication which ended December 31, 2006. [AR 4.]

## III.   **STANDARDS FOR DETERMINING DISABILITY**

In determining disability, the Commissioner applies a five-step sequential evaluation process.[4]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then

---

[4]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

4

shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[5]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[6] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .;"[7] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[8] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[9]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[10] age, education and past work experience, he is capable of performing other work.[11]

At step five, the ALJ can find that the claimant met his burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational

---

[5]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[6]20 C.F.R. § 404.1520(b) (1999).

[7]20 C.F.R. § 404.1520(c) (1999).

[8]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[9]20 C.F.R. § 404.1520(e) (1999).

[10]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[11]20 C.F.R. § 404.1520(f) (1999).

testimony might be used to demonstrate that the claimant can perform other jobs in the economy. Id. at 669-670.  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[12]

 In this case, the ALJ concluded Carpenter was not disabled at step five of the analysis.  Her findings were supported by the framework of the grids and testimony of the vocational expert.  [AR 50-51.]

## IV.    STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

---

[12]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

In this case, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

## V.    **MEDICAL HISTORY**

The administrative record in this case is almost 1000 pages. [AR 1-959.] However, the Court observes that perhaps as many as several hundred pages of medical records are duplicates or triplicates. [*See, e.g.,* AR 18, 890; 22, 237; 25, 234; 28, 301-05 579-83; 108, 134; 517, 598-608; 533, 669; 547-67, 624-44; 535, 610; 339, 655; 334, 586; 241, 311, 846; 475, 713, 714; 309, 844.][13]

### *Older Medical Records (1992-1999)*

Although it is not entirely clear why medical records as old as 1992-1999 impact a relevant period of adjudication from September 2005 to December 2006, Carpenter supplied a number of medical records that are 15-20 years old.[14]  The Court briefly summarizes these records in pertinent part for the sake of providing a background picture that is not always consistent with Carpenter's various statements to medical care providers that he had no prior injuries.

As early as 1992, Carpenter saw Dr. Saltzman for work-related injuries.  On December 22, 1992, Carpenter reported to Dr. Saltzman that he was injured on October 17, 1992 when he dropped a manifold on his left foot and fractured it. [AR 885.] Also in December 1992, Carpenter noted to

---

[13]It is unclear why the duplication could not have been removed from the administrative record, thereby facilitating and expediting the Court's review of the records.  Even counsel's assertions that he presented "new and material" evidence to the Appeals Council in 2009 is inaccurate.  Some of the purportedly "new" medical records were already in the administrative record. [Doc. 17, p. 2.; AR 22, 25, 28, 301-05; 579-83; 892.]

[14]*But see* Hamlin, 365 F.3d at 1223 n. 15 (holding medical reports predating disability period at issue "are nonetheless part of [the claimant's] case record, and should have been considered by the ALJ").  Here, however, many of these older records significantly predate the relevant time frame.

a therapist that he had suffered back pain since injuring it in 1982. [AR 881.] In 1994, Carpenter complained to Dr. Saltzman of severe lower back pain after injuring his back working at a concrete company. [AR 876.]

A physical therapy record, dated February 12, 1999, noted Carpenter's "long standing back problems." [AR 871.] He had raced motorcycles for 12 years with "numerous spills." He had been seeing a chiropractor for two years. Carpenter said he was "full of pain pills and muscle relaxors," and that he had had a few beers before coming to therapy on this date. [AR 871.] A March 1999 physical therapy record indicated Carpenter had been seen only twice out of seven scheduled appointments because he was too busy and had too much going on in his life. [AR 868.]

### *2001 Medical Records*

On May 22, 2001, Carpenter was seen in the ER for pain in his side, shoulder, elbow, and knee. His medications were recorded as a "few beers." He had been riding a motorcycle without a helmet and had passed out. The medical care employee noted his breath was positive for alcohol. [AR 575.]

On August 15, 2001, Carpenter was injured while working as a diesel mechanic. [AR 318, 571.] He did not work after this date. He was seen at the ER for left shoulder pain and difficulty moving his left arm. On August 23, 2001, Carpenter visited Dr. Saltzman regarding his injury at work. The pain was so severe he could not lift his left shoulder. He had been told he had a torn rotator cuff. He could not work due to the pain and weakness in his grip. [AR 318.]

On August 30, 2001, Carpenter again saw Saltzman for constant pain in his left shoulder with intermittent episodes of tingling and numbness of fingers in his left hand. He had some weakness in grip strength and difficulty lifting his left shoulder and arm. Dr. Saltzman's impression was left rotator cuff tear. He recommended that Carpenter see an orthopedic surgeon specialist for surgery.

8

This record indicates Carpenter was excused from any form of gainful employment due to the "disabling nature of the left shoulder injury." [AR 317.]

An MRI suggested a full thickness tear involving the supraspinatus tendon in his left shoulder. There were prominent degenerative changes in the AC joint. [AR 316, 570, 862.]

On September 6, 2001, Carpenter saw an orthopedic surgeon, Dr. Blevins. [AR 501.] The medical record indicates Carpenter was ambidextrous. He explained the workplace injury and denied having any previous problems. He also denied having neck problems; his cervical spine range of motion was good. Carpenter was taking no pain medications. He reported nine earlier eye surgeries for detached retinas. [AR 501.]

On September 14, 2001, Carpenter was seen for a preoperative examination. He denied any injury before August 15, 2001. He also reported problems with his right shoulder at this time. The proposed surgery was complicated but he and his mother believed he should proceed with surgery due to his lifestyle. [AR 377, 497-98.] On September 25, 2001, Dr. Blevins performed surgery on the left shoulder. The diagnosis were rotator cuff sprain and shoulder sprain, accident from overexertion and accident on industrial premises. [AR 362.] He had "rotator cuff extensive tears and possible labral tears." [AR 496.] He was admitted for pain control after his subscapularis repair and was doing well on September 27 with pain medications. [AR 364; 385-89, 505, 702.]

On October 2, 2001, Dr. Blevins saw Carpenter, who stated he was doing "very well" seven days after surgery. [AR 494.] On October 18, 2001, Carpenter's pain was decreasing and the incision was "well healed." He was "quite pleased overall." [AR 491-92; 688; 855.] Carpenter started physical therapy around October 25, 2001, and regularly attended therapy sessions through

9

December 2001.[15]  He had 27 therapy appointments in 2001. [AR 789-828.] Many of the records

indicate improvement. [AR 793, 795, 801, 803, 833, 835.] Others indicate some numbness or

stiffness.

When Carpenter saw Dr. Blevins on November 7, 2001, he was "doing well."  His shoulder

was stable although sore. [AR 490.] On December 3, 2001, Dr. Blevins again noted Carpenter was

doing well. [AR 489.]

### *2002 Medical Records*

Carpenter continued physical therapy for his left shoulder from January 2, 2002 through

March 22, 2002. [AR 721, 726-786.] Carpenter canceled some appointments or did not show up as

scheduled.  [AR 785, 776, 766, 748, 744, 745.] The therapy records consistently showed

improvement, although there are a few sessions when Carpenter was feeling weak or stiff.  On

---

[15]Plaintiff's counsel's assertions that Carpenter started physical therapy in December 2001 are inaccurate. [Doc. 17, p. 5.] Indeed, Plaintiff's opening brief contains a number of inaccuracies, misstatements, and overstatements of the medical records.  For example, Dr. Saltzman did not "restrict[] Mr. Carpenter from doing any work" in August 2001, but did restrict him from working "during this time" while Carpenter attempted some conservative therapy and obtained an MRI. [Doc. 17, p. 4; AR 865.] Also inaccurate is Plaintiff's assertion that Carpenter's "consistent work history spann[ed] nearly 30 years" when it actually spanned 20 years. [Doc. 17, p. 3; AR 116-17.] Carpenter claimed as of October 18, 2001, he continued to have decreased range of motion and stiffness and pain but omitted any mention that he and his doctor were "quite pleased overall" on this date.  [Doc. 17, p. 4; AR 855-56.]  Plaintiff claimed he was "given a prescription for Celebrex" on January 10, 2002, when he actually was given samples to be taken as needed.  [Doc. 17, p. 5; AR 854.] Plaintiff commented that on March 7, 2002, Dr. Blevins "noted improvement" in his left shoulder but failed to mention Dr. Blevins indicated the shoulder range of motion was "excellent." [Doc. 17, p. 5; AR 849.] Plaintiff stated on April 2, 2002, Dr. Blevins "once again recommended surgical intervention," implying that the doctor made the decision,.  The records describe a discussion of conservative to aggressive treatments but that Carpenter wished to proceed with surgery. [AR 681-82.] After the second shoulder surgery, Plaintiff's counsel noted the records indicated "some improvement primarily to the right shoulder which showed some signs of impingement and range of rotation was nearly half that of his left shoulder." [Doc. 17, p. 6.] The same record documented the doctor's impression of "doing very well both shoulders." [AR 476.] These are just some examples Plaintiff's misstatements or overstatements of the medial record.  The Court finds briefing  more persuasive when it accurately reflects the medical record.

January 8, 2002, Dr. Blevins noted that Carpenter's left shoulder was doing well but he was having more problems with his right shoulder. [AR 488.]

At a January 9, 2002 therapy session, Carpenter or the therapist was pleased with his progress. [AR 781.] A day later, Carpenter saw Dr. Saltzman and complained of an "aching type" pain in his left shoulder, neck pain, and pain between the shoulder blades. He also suffered from tingling and numbness of his thumb and index fingers over the last few weeks. Dr. Saltzman gave him instructions for neck strengthening exercises and encouraged Carpenter to continue with range of motion and stretching exercises to the left shoulder. He gave him samples of Celebrex. [AR 315.]

The mid-January 2002 physical therapy records indicated continuing improvement of Carpenter's left shoulder. [AR 769, 771, 774.] However, his right shoulder was now more painful than his left. [AR 767.] On February 20, 2002, the therapy record showed Carpenter was doing and feeling "great." [AR 746.]

On March 7, 2002, Carpenter saw Dr. Blevins who stated the surgery result on his left shoulder was "excellent." However, he was having right shoulder problems. He denied any history of injury. [AR 487.] An MRI performed in March indicated severe degenerative changes, impingement, and a possible partial thickness tear in his right shoulder. [AR 436.] On March 21, 2002, Dr. Blevins wrote that Carpenter was doing "great" on his left side but continued to have right shoulder pain. He primarily had difficulty with overhead and cross-body positions. [AR 682.]

The physical therapy discharge summary, dated March 24, 2002, described significant improvement on the left shoulder. [AR 718.] He reported no pain as to overhead motion. While having some weakness, he was observed to have 5/5 strength. Carpenter now had more complaints about his right shoulder. [AR 719.]

11

On April 2, 2002, Carpenter was seen by Dr. Blevins for a preoperative visit for right shoulder surgery.  His cervical spine range of motion was moderately limited and positive for impingement. [AR 484.] The MRI indicated impingement and most likely, a torn tendon.  Carpenter wanted to proceed with surgery, which was described as an elective procedure. [AR 447, 483.]  On April 5, 2002, Carpenter had full range of motion in his neck. [AR 448.]

On April 5, 2002, Carpenter had the procedure on his right shoulder.  There was a small and partial tear. [AR 454.] He did well and was healing well. [AR 481.] As of April 16, 2002, Carpenter was taking minimal to no pain medications and doing "quite well." [AR 480.] He was given a new referral for physical therapy. [AR 480.] On June 17, 2002, both Carpenter and Dr. Blevins believed his right shoulder was improving. [AR 478.] On October 9, 2002, Dr. Blevins noted that Carpenter's two shoulders were doing "very well." [AR 476.]

### *2003 Medical Records*

Carpenter saw Dr. Blevins on January 31, 2003.  He reported feeling better and having increased his activities.  He was "close to returning to work."  He felt he could work if he did not lift such heavy weight. [AR 475.] He testified that he previously lifted over 100 pounds at work. [AR 900.]  Dr. Blevins noted that Carpenter's shoulders were both healing well.  Carpenter opted to be placed on maximum medical improvement for his left shoulder, but it was felt his right shoulder still might improve.  Carpenter declined a steroid injection to his right shoulder.  Dr. Blevins gave Carpenter a release to return to work with a limitation of lifting no more than 50 pounds. [AR 475.]

Carpenter saw Dr. Saltzman a week later on February 6, 2003.  He complained of neck and shoulder pain.  Carpenter's left shoulder pain was "much worse than his right shoulder pain." [AR 241.] Dr. Saltzman may have meant his right shoulder pain was worse, but it is unclear.  According

to additional notes, Saltzman wrote that Carpenter felt the results of his right shoulder surgery were much better than his left shoulder surgery. These notes conflict with other medical and therapy records, as it appeared that the surgery on his left shoulder was successful. Indeed, Dr. Blevins believed that both shoulders were doing well just one week prior to this visit to Saltzman. Carpenter told Dr. Saltzman that he did not believe the 50 pound lifting restriction from Dr. Blevins was realistic. While he might be able to lift that much weight occasionally, Carpenter believed this would cause him a setback. [AR 241.] Dr. Saltzman found a total impairment of the left shoulder of 25% with a "resultant impairment to whole body" of 15%. [AR 241.] Dr. Saltzman found a right shoulder impairment of 20% and a "resultant impairment to whole body of 12%." [AR 847.] Dr. Saltzman then wrote:

> the patient's whole body impairment, which includes his cervical spine (8% ) and pain (3%) , left shoulder (15%) and right shoulder (12%) is 38%.

[AR 847.] Dr. Saltzman imposed lifting restrictions of no more than 20 pounds occasionally and 10 pounds frequently. [AR 847.] Carpenter was to avoid activities that required internal, and especially external rotation of both shoulders or pushing, pulling and carrying. Dr. Saltzman restricted him from working more than four hours per day for five days per week. [AR 847.] This record does not indicate that Dr. Saltzman performed an examination of the cervical spine to justify the 8% impairment, nor how he concluded there was a pain impairment of 3%. It is unclear why Dr. Saltzman limited Carpenter to a four-hour workday.

In late March 2003, Carpenter was seen at the New Mexico Eye Clinic because of broken glasses. [AR 354.] Carpenter reported he had no primary physician at this time. The record indicated he was in "good gen. health."

13

Dr. Blevins released Carpenter to work with a lifting restriction of 50 pounds, and a week later, Dr. Saltzman also released him to work with different limitations. However, Carpenter did not secure employment at that time or any time after August 15, 2001.

Carpenter did not see Saltzman for another seven months. On September 9, 2003, Carpenter complained of "severe neck pain," pain between the shoulder blades, and headaches with intermittent radiation of pain and numbness. The neck pain had worsened over the last months and never subsided. He frequently experienced muscle cramping and pain between the shoulder blades. Carpenter had "not been able to resume any form of gainful employment due to persistence of shoulder and neck pain." [AR 309.] At this time, Dr. Saltzman believed Carpenter might need surgical intervention and a possible fusion. He gave him samples of Celebrex and noted Carpenter was "not capable of any form of sustained gainful employment." [AR 309-310; 844.]

On September 12, 2003, just four days after seeing Dr. Saltzman, Carpenter visited Dr. Blevins. The orthopedic surgeon noted that the left shoulder was well and the right shoulder had occasional muscle spasms and twitching. Carpenter complained of "some" numbness and tingling in his right fingers. On exam, he had good range of motion with a moderately painful "arc" on the right side. He had "good strength of internal, external rotation and elevation." The left shoulder was doing well; the right had impingement-like symptoms. Dr. Blevins recommended that Carpenter speak to Dr. Saltzman about additional testing of the neck. [AR 474.]

There are no additional records from 2003 or 2004 and nothing to indicate whether Carpenter followed up with Dr. Saltzman about his possible cervical problems for the next two years or more.

### *2005 Medical Records*

On January 28, 2005, Carpenter was taken to the ER after a motorcycle accident. He was not wearing a helmet and had crashed into a tree. [AR 517-18.] His blood alcohol was 144, and he

14

was described as intoxicated. [AR 549.] He denied neck pain at this time, and there were no injuries to his back. But, he complained of pain to the arm and leg and suffered head abrasions. [AR 517-532, 598-608.] Carpenter had xrays of his shoulder, elbow, forearm, thoracic spine, lumbar spine, right foot, ankle, and knee, along with a CT of his head. [AR 549, 342-49.] He had multiple extremity fractures and contusions but no significant chest pain or abdominal trauma. [AR 535.] He had fractures of his right elbow, left forearm, and right knee.  [AR 336, 533.] Dr. Garard performed procedures to repair the fractures. [AR 350, 537.]

On March 2, 2005, Dr. Garard saw Carpenter for a follow-up visit.  He wanted Carpenter to continue to work on range of motion and offered him physical therapy, but Carpenter stated he had no insurance.  The medical record indicated that Dr. Garard was going to see if he could get therapy for Carpenter. [AR 338.]

On March 23, 2005, Dr. Garard noted that Carpenter was "working with therapy." [AR 336.] He was there for "routine orthopedic follow-up without complaints."  His right knee had full extension and 90 degrees flexion.  His right ulna had full range of motion.  He had about "40 degrees extensor lag short of full extension of his right elbow."  He had about 100 degrees of flexion.  Dr. Garard thought Carpenter was "doing well" but they needed to "work hard with therapy."  "There is a delay in getting this going, and this is unfortunate." [AR 336.]

Carpenter filled out earlier disability applications in April 2005, that were denied and not pertinent to his 2006 benefit application. [AR 126, 131.]

On May 4, 2005, Dr. Garard stated that Carpenter was doing well and "has been working with therapy." [AR 335.] His biggest complaint was pain over the distal incision on his left forearm. He had full extension and 130 degrees knee flexion and no tenderness.  He had full pronation, supination and range of motion of the elbow.  He had about 100 degrees flexion in his right elbow

15

and lacked about 45 degrees full extension.  Xrays of all three injuries showed excellent alignment.  The record indicated Carpenter was to continue physical therapy but there are no corresponding physical therapy records in the administrative record for this period.  [AR 335.]

On June 15, 2005, Dr. Garard again noted that Carpenter was seen for a follow-up appointment and had been doing therapy.  He had full range of motion of the knee.  He had full pronation and supination of the left forearm.  There was no pain on palpation of the incision.  The right elbow had fairly significant range of motion problems with extension.  The left forearm was healed.  "He is doing quite well and is quite satisfied with his level of function." [AR 334.]

With respect to his earlier disability applications, he claimed to be unable to work because of weakness in the right elbow and loss of range of motion.  [AR 169.]

### *2006 Medical Records*

On March 20, 2006, Carpenter saw Dr. Saltzman for "an update and evaluation," although according to the administrative record he had not seen Saltzman since September 2003.  Carpenter complained of neck pain, shoulder pain, intermittent headaches, blurred vision in the left eye, bilateral shoulder pain, numbness into the right arm, lower back pain, and radiating pain.  He had difficulties doing any lifting with the right arm and was unable to extend the right elbow.  He experienced pain, swelling, and popping in the right knee.  He could not sit for long due to pain in the lower back.  This medical record described the motorcycle injury in 2005 and Dr. Garard's treatment.  Dr. Saltzman examined Carpenter and reviewed xrays taken on March 20, 2006.  The xray reports from March 20, 2006 are not in the administrative record.  Dr. Saltzman's impressions were:

> advanced severe cervical and lumbar DJD with cervical and lumbar
> spondylosis and degenerative arthritis of right knee and degenerative

16

arthritis and ankylosis of right elbow and healed fracture of left ulna
and bursitis both shoulders with surgically repaired rotator cuff tears.

[AR 32, 301.]  Based on what Dr. Saltzman described as "numerous severe orthopedic problems as

well as detached retinas and cataract and blindness in left eye, it is not feasible to consider this

gentleman capable of any realistic form of gainful employment."  Dr. Saltzman believed Carpenter

would need surgery of the spine in the future.  He might also need a partial patella replacement as

well as cataract surgery.  Dr. Saltzman recommended nonsteroidal anti-inflammatory medications,

muscle relaxants, analgesic medications, and physical therapy.  He concluded that Carpenter "should

definitely qualify for total disability." [AR 32.]

At this time, Carpenter had no disability application pending as the earlier applications were

denied and not appealed.  On April 3, 2006, he wrote a letter to disability services seeking to file a

new claim and an appeal of the previous denial of claim.  His current application for DIB was

considered filed on April 5, 2006. [AR 40.] Any appeal of the prior denial was untimely.

On April 13, 2006, he filled out an adult function report stating he could not help care for

pets or do anything physical.  However, he did not have any problems with daily activities.  He did

not cook, but kept his room clean and cleaned the kitchen after meals.  He went out ever day and

drove.  He went to the grocery store with his mother and could pay the bills. [AR 161-64.] His

arthritis and joint injuries prevented him from working at this time.  During a face-to-face meeting

with a disability services interviewer, Carpenter was observed only to have problems sitting. [AR

222-23.]

In another adult function report, filled out less than a month after the first report, Carpenter

described his activities as getting up in the morning, reading the paper, getting dressed, and doing

household chores.  He ate meals, read, watched television and built models.  He helped with dinner

and cleaning up.  He fed the pets.  He complained of headaches one to two times a week and sometimes had trouble putting on a shirt.  He could not see the right side of his face to shave and had little range of motion in his right arm. [AR 153-54.] He made his own lunch and could do all light chores, including laundry and cleaning for about two hours a day.  He shopped once a week for several hours. [AR 156.] Friends stopped by several times a week. [AR 157.] He was not supposed to lift over 20 pounds.  Carpenter described all of his extremities as being wired or screwed together. [AR 158.] His attention span was normal and he followed all instructions "very well."  He also got along well with others and handled stress fine.

There is an undated disability report from around this time frame in which Carpenter reported he had "some depression" because he could not do the things he did before. [AR 226.] He was taking Aspirin and Tylenol for pain, and Robaxin to help with muscle spasms. [AR 232.]

In mid-June 2006, Carpenter had a cataract removed and did well postoperatively. [AR 270, 275.] At a June 21, 2006 eye appointment procedure, he was taking no medications. [AR 278.] Under the "musculoskeletal" column, the box for "no problems" is checked.

On July 7, 2006, Dr. Bocian performed a physical RFC assessment for disability services. [AR 292.] Based on a review of the medical records, Dr. Bocian found Carpenter could occasionally lift up to 20 pounds and frequently lift 10 pounds.  He could stand, sit or walk for six hours and was unlimited in the ability to push and pull.  Dr. Bocian noted Carpenter took only non-prescription pain killers. [AR 293.] He also summarized Carpenter's motorcycle accident that occurred in early 2005, when Carpenter was intoxicated, along with the injuries he sustained.  Dr. Bocian found frequent postural limitations as to kneeling but occasional limitations in all other categories. Carpenter was limited in his ability to reach overhead but unlimited as to handling, fingering, and feeling.  The overhead reaching limitation was due to rotator cuff surgeries on both shoulders.  There

18

were no visual limitations.  Although Carpenter reported problems with cataracts, he could drive, work on models, and watch television.  He was to avoid extreme cold and wetness due to degenerative joint disease. [AR 296.]

Dr. Bocian acknowledged that there were treating doctor conclusions that significantly differed from the impairments Dr. Bocian found. [AR 298.] Dr. Bocian set forth some of those differing limitations, along with inconsistencies in Dr. Saltzman's limitations.  Dr. Bocian concluded that Dr. Saltzman's findings on examination of Carpenter and Saltzman's function reports were consistent with Dr. Bocian's lifting limitations.  Dr. Bocian found that Carpenter was capable of light exertional work. [AR 298.]

On July 18, 2006, Carpenter's initial DIB application was denied. [AR 62, 104.]

On July 21, 2006, a medical records notes that Carpenter's procedure for cataracts was a success and that his eye looked great. [AR 266.]

On July 26, 2006, Carpenter filed a request for reconsideration. [AR 102.] The request was denied on December 29, 2006. [AR 61, 96, 260.]

### *2007 Medical Records*

On January 8, 2007, Carpenter filed a request for an ALJ hearing, stating his injuries prevented him from working. [AR 90.]

There is a single medical record from 2007, when Carpenter saw Dr. Saltzman on July 10, 2007.  [AR 25.][16]  This appointment and examination occurred seven months after the relevant period.  Carpenter was there to be re-evaluated.  He did not feel much different than when Dr. Saltzman last saw him over a year earlier in 2006.  He suffered from frequent episodes of neck pain

---

[16]Some portions of Dr. Saltzman's 2007 record are virtually identical to paragraphs in the 2006 record, *e.g.,* examination of cervical spine and measurements of mobility. [AR 25, 29.]

and pain between the shoulders.  His weekly headaches were so severe that he had to go to bed for

two to three days.  He tried to avoid lifting as he felt more pain.  Carpenter complained of frequent

tingling and numbness in his thumb, index fingers and middle fingers in both hands.  He had

insomnia from neck and back pain.  He could not extend his right elbow and his right knee was

swollen and painful.  On exam, Dr. Saltzman noted tenderness over many areas.  His impression was

advanced severe cervical thoracic, and lumbar degenerative joint disease with cervical and lumbar

spondylosis and degenerative arthritis of the right shoulder and right knee.  Dr. Saltzman again

concluded Carpenter was not capable of any form of gainful employment and that most likely he

would need surgery on his cervical spine in the future.  He was to continue with nonsteroidal anti-

inflammatory medications and muscle relaxants.  According to Dr. Saltzman, Carpenter was an

"excellent candidate" for social security and total disability. [AR 25, 234.] It does not appear that

any xrays were taken in relation to the 2007 examination and findings.  Instead, Dr. Saltzman

apparently relied to some degree on xrays from early 2006, although those xray reports are not part

of the administrative record.

### *2008 Medical Records*

On January 31, 2008, over a year after the relevant period, Carpenter again saw Dr. Saltzman

for an updated medical evaluation.  His complaints were similar to those described to Dr. Saltzman

in 2006 and 2007. [AR 22.] Xray results are referred to in this record, but there are no corresponding

xray reports that are part of the administrative record.   Dr. Saltzman's impression was: "cervical

and lumbar DJD and degenerative arthritis right elbow and right knee and bilateral rotator cuff tears

of shoulders (by history)." [AR 24.] Based on Carpenter's "numerous complaints" and "extensive

pathology" regarding his cervical spine, right elbow, right knee, and visual disturbances, Dr.

Saltzman concluded he was not capable of performing any form of gainful employment. [AR 24.]

On February 22, 2008, Dr. Saltzman filled out a disability questionnaire for Carpenter and provided the following impairment ratings: cervical 15%, right elbow 20%, lumbar 10%, left shoulder 25%, and right shoulder 20%.  He also noted psychological issues including depression, chronic pain and fatigue 15%. "Additional testing for Impairment rating of eyes, not able to accurately assess. (at least 15%)" [AR 242.] Dr. Saltzman found Carpenter credible and that he could not return to his prior work.  He also concluded Carpenter's condition was "permanent and will persist forever."  Dr. Saltzman further decided that Carpenter's reports of chronic pain, fatigue, and inability to sit or stand for more than an hour or two were reasonable in light of his injuries. [AR 242-43.] Dr. Saltzman stated Carpenter "has not been able to work even on a sedentary basis since August, 2001."  He also found that knee surgery for Carpenter was "inevitable," cervical spine surgery would be necessary, and he should have the plates and screws removed from his right elbow, left forearm, and right knee. [AR 243.] According to Dr. Saltzman, all activities of daily living, social functioning, concentration, persistence and pace and deterioration in work settings were considered "extreme psychological impairments." [AR 243-44.] He was prescribed Celebrex ("samples of anti-inflammatory and pain"), Ultram (pain), Robaxin (muscle spasms), and Elavil (sleep and depression).  [AR 244.]

On February 26, 2008, the ALJ conducted a hearing in Farmington, New Mexico.  Carpenter was represented by former counsel, and Dr. Saltzman was present to testify.  Carpenter testified that he lived with his mother, could drive "a little bit" every day, was right-handed, and had not worked since the workplace injury in August 2001. [AR 897-99.] Carpenter tried to find other work that did not require such heavy lifting but was never hired. [AR 900.] Carpenter described vision issues for many years, although he was still able to work notwithstanding those problems. [AR 902-03.]

21

Carpenter also testified that he took Fiorinal that his mother gave to him for his headache pain. [AR 906.] He claimed he was unable to use his right arm much. [AR 907.] He had learned to write his name with his left hand. [AR 908.] Carpenter tried to build plastic model airplanes as a hobby but could only sit for an hour before needing to move. [AR 909.] His neck, shoulder, and back pain required him to keep shifting.  Carpenter described his typical day as not doing much. He had a cup of coffee, read the paper, worked on his models, watched TV and visited with his mother. [AR 911-12.] He had no house chores; his mother did all the work. [AR 912.]

With respect to depression, Carpenter said he felt depressed for not having worked in the last six to seven years.  He felt "down." [AR 912.] Dr. Saltzman prescribed Elavil for his depression and insomnia. [AR 912.]

The ALJ asked Carpenter how often he had visited a doctor in the past three years. Carpenter thought he had seen his doctor about six times a year.  He admitted that he had not asked his doctor for any prescription pain medication. [AR 915.] He thought Elavil helped with his depression. [AR 916.] Although his doctors had suggested regular exercise, Carpenter had not been exercising for six or eight months. [AR 917.]

Carpenter's attorney clarified that while Carpenter thought he had seen Dr. Saltzman six times a year, the records indicated he had seen Saltzman only once a year, each of the past three years. [AR 919.]

Dr. Saltzman testified that he was an orthopedic surgeon in Farmington and had practiced there since 1984. [AR 922.] He had seen Carpenter over the years and concluded Carpenter's spine continued to deteriorate. [AR 926.] He believed his shoulder pain related to neck problems.  Dr. Saltzman did not think Carpenter could stand for two hours at a time. [AR 928.]

22

Dr. Saltzman also testified that he often encountered a psychological component in patients he treated with orthopedic injuries. However, he stated he would not prescribe medication for depression if it were a "lesser depression," and would refer the patient out for treatment if there were moderate to marked limitations in activities of daily living, etc. [AR 930.] Dr. Saltzman agreed that his earlier medical reports did not mention Carpenter's depression. [AR 932.]

The ALJ also discussed the 2003 medical record from Dr. Saltzman noting a whole body impairment of 12%. [AR 933.] The ALJ asked how Dr. Saltzman got from a 12 or 20% limitation in one of four extremities to 100% disability in his ability to work more than four hours a day. [AR 934.] The answer was not entirely clear. With respect to how Dr. Saltzman decided what amount of weight Carpenter could lift (in 2003), he testified that he considered subjective complaints, as well as the examination. [AR 937.] Dr. Saltzman did not believe he did any testing in 2006, 2007, or 2008 that contributed to his medical opinions those years. [AR 938.] He further testified he did not specifically record any range of motion testing during examinations in 2006, 2007, or 2008. [AR 939.]

In questioning the vocational expert, the ALJ asked her to assume the individual was 46 to 49 years of age, with a high school education, and that he had a history of skilled work without transferrable skills. He could lift 20 pounds occasionally and 10 pounds frequently and could sit, stand, and walk up to six hours a day. He was unable to work overhead or reach above the shoulder and unable to stoop, kneel, crouch, crawl, or climb more than occasionally. [AR 948.] The VE testified that there were jobs he could perform under that hypothetical – a courier/message deliverer (light unskilled), customer service attendant (light unskilled), and parking lot attendant (light unskilled). [AR 948-49.]

23

As a second hypothetical, the ALJ added the limitation that the individual needed to move around five or ten minutes from a sitting position once every hour, or to sit five to 10 minutes every hour after standing.  The VE testified this would not change her answer as to possible jobs Carpenter could do under the hypothetical. [AR 949.] If, however, the individual were required to sit and stand at his own will, he would be unable to perform the identified jobs. [AR 949.]

The ALJ then asked the VE if jobs still existed where the individual was unable to stand or walk four hours of a day (assuming the all other facts from the first hypothetical).  The VE testified that the courier job would remain but the other two positions would not.  However, the individual could do a shipping and receiving weigher position within a limitation of standing and walking four hours out of eight. [AR 950.]

The ALJ added a limitation that the individual was unable to grasp forcefully with the right upper extremity.  The VE believed the parking lot attendant and shipping and receiving weigher positions would remain.  He also could perform the job of a ticket taker. [AR 950-51.] The VE also testified Carpenter could perform some sedentary positions based on a revised hypothetical. [AR 951-53.]

Carpenter's attorney asked the VE to consider whether Carpenter could do any job if he had to lie down two to three times a day for 15-30 minutes on an unscheduled basis.  [AR 956-57.] The VE testified no jobs would exist under that hypothetical.

On August 7, 2008, the ALJ issued an opinion denying Carpenter's benefits application. [AR 40.] The ALJ determined Carpenter had met the insured status requirements through December 31, 2006 and had not engaged in substantial gainful activity since August 15, 2001. [AR 42.] The ALJ found that Carpenter had severe impairments of mild degenerative disc disease and scoliosos of the lumbar spine, post trauma pain in the left shoulder with limited range of motion, degenerative joint

disease of the right shoulder, post surgical repair, and chronic right knee pain post a healed fracture. [AR 42.]

The ALJ also determined, in part that there was no support for the allegation that Carpenter was unable to use his right arm or that it was "extremely restricted."  The impairment to his right shoulder, however, limited his use of his right arm with respect to reaching, lifting, or performing work overhead – limitations which were incorporated in the RFC. [AR 43.] The ALJ did not find support for severe vision problems or severe headaches. [AR 43.]

None of Carpenter's impairments or combination of impairments met or equaled a listing as per the ALJ's detailed discussion of several listings, including 1.02A, 1.02B, and 1.04A. [AR 43-44.]

The ALJ did not find any medically determinable impairment with respect to alleged depression. [AR 44.] Again, the ALJ provided lengthy discussion of the record with respect to allegations of depression and explained thoroughly why she allowed no deference to Dr. Saltzman's opinion as to this possible diagnosis.

The ALJ decided that Carpenter retained the RFC to lift and carry, push and pull 20 pounds occasionally and 10 pounds frequently, stand and walk six hours and sit six hours but was unable to lift, push or pull or reach overhead with his upper extremities and also was unable to perform work above his shoulder level.  He was to avoid concentrated exposure to cold and wetness and needed to move around or change position for five to ten minutes once an hour.  He could only occasionally stoop, climb, balance, crouch, and crawl. [AR 45.] In reaching this RFC, the ALJ provided extensive discussion of medical records from the early 1990s to the present. [AR 45-50.]

The ALJ determined Carpenter could not perform his past relevant work.  Based on his (younger) age, education, work experience, and RFC, the ALJ found that jobs existed in significant

numbers that he could perform.  The ALJ noted that this finding was supported by the framework of the grids and vocational expert testimony. [AR 50-51.]

On October 6, 2008, Carpenter filed a request for review arguing that the decision does not reflect his true disability. [AR 36.]

### *2009 Medical Records*

At some point in 2009, Carpenter secured new legal counsel.

On February 23, 2009, Carpenter's mother submitted a letter to the Appeals Council on his behalf, stating that he probably had a broken neck from his motorcycle accident.  She also stated that his retina and neck problems may have resulted from a very active childhood and motocross racing. She could not see him being able to return to work. [AR 888.]

On March 10, 2009, Dr. Saltzman filled out a Medical Assessment of Ability to Do Work-Related Activities that was provided to the Appeals Council.  Dr. Saltzman opined that Carpenter could not lift more than five pounds and could not stand or walk more than two hours.  Dr. Saltzman concluded that Carpenter could never kneel, stoop or crouch and could only occasionally crawl. [AR 892.] He had marked limitations in maintaining regular attendance/punctuality, maintaining physical effort for long periods without a need to decrease activity or pace, completing a normal workday and workweek without interruptions from pain or fatigue, and performing activities within a schedule. [AR 893.] Dr. Saltzman noted that the medical findings supporting this 2009 assessment were a physical exam in early 2006, a physical exam in mid-2007, and a physical exam in early 2008.  He also referred to xrays of March 2006 and January 2008. [AR 892.]

In Plaintiff's counsel's letter of March 26, 2009, the onset date of disability was changed to April 5, 2005. [AR 18, 890.]

On September 17, 2009, Dr. John Vigil from "Doctor on Call" performed a consultative exam on Carpenter at counsel's request.  This report was provided to the Appeals Council who considered it to be irrelevant information about a later time. [AR 4, 8.] Dr. Vigil spent 30 minutes reviewing medical records and 30 minutes of face-to-face time with Carpenter, including an examination. [AR 9.] He had no imaging studies to review. [AR 12.] Dr. Vigil concluded, based on the medical record and consultative evaluation, that Carpenter was permanently and totally disabled. Dr. Vigil further opined that Carpenter would not be able to perform even sedentary work on a full-time or sustained basis. [AR 14.]

### *2010 Record*

On May 13, 2010, the Appeals Council denied the request for review. [AR 3, 6, 7.]

## VI.   DISCUSSION

Carpenter argues that the Court should reverse or remand this matter because the ALJ's credibility assessment was unsupported by substantial evidence and the ALJ failed to apply the relevant legal standards.  The second argument is that the ALJ committed legal error in failing to give controlling weight to Dr. Saltzman's opinions.

### A.   Credibility Determination

Credibility findings are "peculiarly the province of the finder of fact, and . . . [will not be] upset . . . when supported by substantial evidence."  Kepler v Chater, 68 F.3d 387, 391 (10th Cir. 1995) (internal citations and quotations omitted).  The reviewing court does not substitute its own judgment for that of the fact finder.  Moreover, a reviewing court recognizes "that some claimants exaggerate symptoms for purposes of gaining government benefits, and that deference to the fact-finder's assessment of credibility is the general rule."  Frey v. Bowen, 816 F.2d 508, 517 (10th Cir. 1987).  However, deference is not an absolute rule. "[F]indings as to credibility should be closely

27

and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."

Kepler, 68 F.3d at 391 (internal citations and quotations omitted).

In evaluating a claimant's credibility as to symptoms, including pain, the Commissioner considers all symptoms that can reasonably be accepted as consistent with the objective medical evidence and other evidence, reports of doctors, diagnoses, prescribed treatment, daily activities, efforts to work, and any other pertinent evidence. 20 C.F.R. § 404.1529(a). A claimant's statements about pain or other symptoms alone does not establish disability. Id. In evaluating the intensity and persistency of symptoms and pain, the Commissioner considers all available evidence, including what medications have been used, how the symptoms affect a claimant's pattern of daily living, the location, duration, frequency, and intensity of pain, precipitating and aggravating factors, type, dosage, effectiveness of medications, treatment, or other measures used to relieve pain. 20 C.F.R. § 404.1529(c)(3). For the reasons explained below, the Court determines that the ALJ's credibility findings were "closely and affirmatively" linked to substantial evidence and that there was no error.

First, the Court does not find persuasive Carpenter's argument that the ALJ's credibility findings are unsupported merely because the ALJ did not specifically mention Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987), and the three phases of inquiry discussed in Luna. See Dellinger v. Barnhart, 298 F. Supp. 2d 1130, 1137 (D. Kan. 2003) (ALJ did not refer specifically to the Luna factors in his decision, but did discuss the evidence relevant to those factors; thus the ALJ did not ignore Luna .) Here, the ALJ conducted the appropriate analysis as to credibility, including whether there was objective medical evidence to establish pain, whether there was a loose nexus between the impairment(s) and Carpenter's subjective complaints of pain, and whether, after considering all of the evidence, Carpenter's pain was disabling. Luna, 834 F.2d at 163. Moreover, while an ALJ must do more than simply recite the general factors that she considered, so long as "the ALJ sets forth the

28

specific evidence she relied on in evaluating Carpenter's credibility, "[her] determination must stand." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). *See also* Poppa v. Astrue, 569 F.3d 1167, 1171 (10th Cir. 2009) ("Our precedent does not require a formalistic factor-by-factor recitation of the evidence so long as the ALJ sets for the specific evidence he relies on in evaluating the claimant's credibility.)" (alteration and quotation omitted).  In this case, the ALJ set forth an extensive discussion of the evidence she relied upon in making credibility determinations, even if she did not specifically mention Luna. [AR 44, 45-49.]

After examining all of the evidence of record and considering testimony, the ALJ explicitly stated she granted Carpenter "partial credibility." [AR 49.] Among many facts, the ALJ considered Carpenter's testimony that he drove every day but claimed to have constant pain in both shoulders and his neck, along with headaches.  She noted his allegations that his knee swelled, he had frequent pain in his lower back, and problems with his vision.  The ALJ reviewed his daily activities, which included watching TV and visiting with others along with assertions that he could not perform any household tasks or yard work. [AR 49.]  *See* 20 C.F.R. §§ 404.1529(a), 416.929(a) (proper to consider activities of daily living in assessing symptoms and credibility).[17]

The ALJ further explained that Carpenter's credibility as to allegations of pain were not supported by objective medical evidence. [AR 49.] Secondly, the ALJ observed that Carpenter's "need for medical care is far less than what would reasonably be expected for an individual having the degree and extent of medical problems the claimant alleges." [AR 49.]

The ALJ proceeded to discuss uncontroverted medical evidence and testimony by Carpenter and his orthopedic physician showing that Carpenter required very little pain medication and was

---

[17]It is noteworthy that function reports for Carpenter were contradictory and variable even though the two reports were filled out within one month. [AR 153, 161.]

treated "both minimally and conservatively for the impairments he alleges." These findings followed

the ALJ's comprehensive discussion of medical records through the years, as early as 1992, when

Carpenter was prescribed "bed rest" and a "heating pad" for complaints of pain. [AR 45.] At that

time, Carpenter was excused from his employment as a diesel mechanic for about one week. [AR

45.] *See* Hargis v. Sullivan, 945 F.2d 1482, 1489 (10th Cir.1991) (holding that among the factors

that an ALJ should consider when evaluating the credibility of pain testimony are the levels of

medication and attempts to obtain relief).[18]  *Compare* Sitsler v. Astrue, 410 F. App'x 112, 117 (10th

Cir. Jan. 10, 2011) (unpublished) (reversing credibility determination in part where record was

"replete with prescriptions and refills for pain medication, including narcotics.")

The ALJ noted that in 1994, when Carpenter complained of severe lower back pain, he was

released from work for five days and prescribed bed rest.  He was released to return to a job

involving heavy labor "without any restrictions." [AR 45.] In 1999, Carpenter again complained of

low back pain lasting three weeks.  Dr. Saltzman recommended Carpenter wear a lumbar corset as

needed, prescribed a TENS unit, referred him to physical therapy for exercises and massage, and

gave him samples of Ultram. [AR 45.]

In 1999 and 2000, Carpenter saw a chiropractor for pain but there are no medical records

indicating medical care until August 2001, when he suffered an injury at work. [AR 45.] Although

---

[18]Carpenter argued that he did not obtain certain medical treatment due to lack of adequate insurance coverage or that the ALJ did not explore whether his lack of medical coverage hindered his ability to obtain medical treatment. [Doc. 17, p. 14.] *See* Threet v. Barnhart, 353 F.3d 1185, 1191 n.7 (10th Cir. 2003) (inability to pay may provide justification for a claimant's failure to seek treatment where there is evidence that claimant sought and was refused treatment).  At the hearing, the ALJ asked Carpenter if he requested prescriptions for pain medication from his doctor, and he said he had not. [AR 915-16.] He did not contend that he could not afford such medication, nor did he provide evidence that he sought to obtain low-cost medical treatment or prescriptions which were refused because of his financial condition.  While his attorney argued that he could not afford some therapy after his motorcycle accident, it appeared from some of Dr. Garard's records that he did receive therapy. [AR 334 (been doing therapy). 335, 336.]

Carpenter's rotator cuff tears in both shoulders required surgeries, the ALJ noted medical records indicating Carpenter was doing well and by March 2002 had "excellent range of motion." [AR 46.]

The ALJ also described physical therapy reports from this time frame showing steady improvement by Carpenter, and that he had "minimal complaints of pain and difficulty."  After the second shoulder procedure, Dr. Blevins, the orthopedic surgeon, described Carpenter's range of motion and strength as "excellent."  In late 2002 to 2003, the surgeon reported that both shoulders were doing very well and that both were healing well. [AR 46.] The orthopedic surgeon actually released Carpenter to work at the end of January 2003, with a lifting restriction of 50 pounds. [AR 46.]

Yet, as observed by the ALJ, Carpenter did not return to work.  Instead, one week after the orthopedic surgeon concluded he could return to work with a 50-pound limitation, Carpenter elected to see Dr. Saltzman, when Carpenter reported a litany of complaints, in contrast to telling Dr. Blevins a week earlier that he was feeling better, increasing his activities, and was close to being ready to return to work. [AR 46, 475.]

Dr. Saltzman found a limited range of motion on the left and right shoulders in early 2003, and restricted Carpenter from lifting more than 20 pounds occasionally.  He did not conclude Carpenter could not work at all, but restricted him from working more than four hours a day.  There is no explanation for Dr. Saltzman's four-hour work restriction and it is contradicted by the surgeon's recommendation that he could lift as much as 50 pounds and return to work. [AR 46.]

The ALJ discussed records from later 2003, when Carpenter saw both Dr. Saltzman and Dr. Blevin just three days apart. [AR 46, 309, 474.] Based on Carpenter's numerous subjective complaints, including severe neck pain, pain between the shoulders, and headaches, Dr. Saltzman's exam, and recent xrays that were not part of the administrative record, Dr. Saltzman determined, in

31

contrast to his report just seven months earlier, that Carpenter could not work at all. [AR 46.] The ALJ also commented that while Dr. Saltzman reported Carpenter claimed to be taking Celebrex daily "to help take the edge off," he was not prescribed any medications in September 2003.

Three days later, Dr. Blevins noted that Carpenter reported his left shoulder was "doing well," and that his right shoulder still had "occasional" muscle spasm and twitching. On exam, Dr. Blevins found good range of motion, "moderately" painful arc on the right side, good strength of internal, external rotation and elevation. Dr. Blevins recommended that if Carpenter's complaints persisted, he see Dr. Saltzman to determine if an MRI of the neck was appropriate. While an injection to the right shoulder for pain was discussed by Dr. Blevins on several occasions, Carpenter rejected that treatment. [AR 474, 475.] The ALJ appropriately discussed and relied on these types of inconsistencies in the objective medical evidence in reaching her credibility determinations.

Even though Carpenter was to see Saltzman again if his symptoms persisted, there are no medical records indicating treatment for his neck over the next several years. [AR 47.] Indeed, the first medical record in early 2005 related to Carpenter's motorcycle wreck when intoxicated and riding without a helmet. [AR 47-48.] *See* Kepler, 68 F.3d at 391 (stating that factors to be considered by ALJ in assessing credibility include extensiveness of attempts to obtain relief and frequency of medical contacts). *See also* Huston v. Bowen, 838 F.2d 1125, 1132 (10th Cir. 1988) (frequency of medical contacts is a factor to be considered in determining credibility).

The ALJ explained why she afforded Dr. Blevins' reports full evidentiary weight, based on their consistency with the record, and why she gave less weight to Dr. Saltzman's reports and opinions, based on their inconsistency with the record. [AR 47.] She also properly discussed the significant distinctions and contradictions between reports of Dr. Blevins and Dr. Saltzman.

The ALJ proceeded to carefully examine Dr. Garard's records after he performed surgery on Carpenter's fractures from the motorcycle crash.  The ALJ noted that Dr. Garard's 2005 notes of examination made no reference to the cervical spine or that Carpenter suffered from cervical pain.  Again, this doctor's reports and examination contradicted those of Dr. Saltzman. [AR 47.]

In discussing the record evidence and testimony, the ALJ also observed that the state agency's non-examining physician found no objective evidence for Dr. Saltzman's restriction to a four-hour work day or his restriction to lifting no more than 20 pounds on a frequent basis. [AR 47.]

Notwithstanding the multiple trauma and fractures from Carpenter's motorcycle accident, Dr. Garard noted he was "doing well" after surgery and that the overall alignment in all three areas of fracture was "excellent." [AR 48.] In March 2006, Dr. Saltzman saw Carpenter for the first time (based on the administrative record) in 2½ years.  In diagnosing severe cervical and lumbar degenerative joint disease with cervical and lumbar spondylosis, degenerative arthritis of the right knee, and degenerative arthritis and ankylosis of the right elbow, Dr. Saltzman referred to xrays that were not part of the record.  Moreover, there are no radiology reports as to those xrays.  The ALJ discussed all of this evidence. [AR 48.] *See* Gunderson v. U.S. Dept. of Labor, 601 F.3d 1013, 1026 (10th Cir. 2010) (remanding but observing that ALJ had discretion to make particular credibility findings as to x-ray readers and different findings as to other doctors).  Even though Dr. Saltzman had not seen Carpenter in over two years, he concluded Carpenter was not capable of any form of gainful employment. [AR 48.] As previously observed, the ALJ properly considered gaps in medical treatment.

In addition, the ALJ explained why she afforded Dr. Saltzman's March 2006 opinions and report no evidentiary weight. [AR 48.] She specifically found his March 2006 report did not cite medical conditions that were verified or medical conditions supported by objective evidence.  The

33

ALJ also afforded no evidentiary weight to Dr. Saltzman's February 22, 2008 disability questionnaire for well-described reasons.[19]

In further assessing Carpenter's credibility, the ALJ found his "testimony was inconsistent with his demeanor (both past and present), with his prior statements, with his daily activities, and with the record as a whole." [AR 49.] The ALJ also observed that Carpenter "sat through a lengthy hearing, was continuously responsive to all questions, and showed no difficulty whatsoever in the following the proceedings, his train of thought, or anyone else's train of thought." [AR 44.]  *See* Qualls v. Apfel, 206 F.3d at 1373 (ALJ may consider her own assessment of plaintiff's behavior and demeanor during the hearing as part of the credibility determination).

The ALJ again gave specific examples of inconsistencies in the administrative and medical record.  [AR 49.] Moreover, she explained why Carpenter's records not only failed to support his allegations of severe limitations, but actually contradicted those allegations.  For example, after surgeries, his operating doctors and physical therapists reported good results. [AR 49.] Although the ALJ afforded some credibility to his allegations of limitations, she noted many pages of treatment records that indicated excellent range of motion, in contrast to Carpenter's contention that he could do "relatively nothing." [AR 49-50.]

---

[19]In addition to the reasons described by the ALJ, the Court, like the Appeals Council, observes that the questionnaire was filled out well outside the relevant period of adjudication.

The ALJ further observed that no objective medical evidence[20] supported a finding that the claimant exhibited an advanced degenerative disease of the cervical spine or an inability to use his right arm.  Moreover, the ALJ noted that even when Dr. Saltzman found Carpenter not capable of any form of sustained gainful employment because of "progressively worsening neck pain" and shoulder pain in September 2003, by January 2005, he was out riding a motorcycle without a helmet while intoxicated. [AR 50.] *See* <u>Atkinson v. Astrue</u>, 389 F. App'x 804, 809 (10th Cir. July 29, 2010) (unpublished) (proper for ALJ to consider inconsistencies in claimant's description of chasing a dog with allegations of disabling knee condition as part of the credibility analysis).

Further supporting the ALJ's conclusions were the findings of the state agency and its non-examining medical experts. [AR 50.]

In addressing issues of credibility, the ALJ did not merely recite the general factors to be considered.  It is clear that the ALJ set forth the specific evidence she relied on in assessing credibility.  The Court concludes that the ALJ's credibility findings were supported by substantial evidence and were not erroneous.

### B.      Treating Physician's Opinions

Under the regulations, the agency rulings, and our circuit law, the ALJ must determine whether a treating physician's opinion is entitled to controlling weight. <u>Watkins v. Barnhart</u>, 350 F.3d 1297, 1300-01 (10th Cir. 2003).  If the ALJ concludes a treating physician's opinion is not

---

[20]Carpenter argued that there were a number of xrays that provided objective evidence to support his allegations of disabling pain. [Doc. 17, p. 11.] However, those tests were performed at times when Carpenter had surgery or surgical repair related to his motorcycle accident.  Subsequent doctors' notes indicated the surgeries generally were successful, if not indicative of "excellent" results.  Carpenter also relied on xrays from January 2008 that are not part of the administrative record and that instead, are merely referenced by Dr. Saltzman, without any narrative report having been prepared apparently.  Moreover, those xrays were taken in 2008, well after the relevant period of adjudication.

entitled to controlling weight, the treating physician's opinion is "still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § ... 416.927." Id. (*quoting* Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4).

When considering a treating physician's opinion, the Tenth Circuit requires a "level of specificity [as to the reasons] that is sufficient 'to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" Andersen v. Astrue, 319 F. App'x 712, 717, 2009 WL 886237 (10th Cir. Apr. 3, 2009) (unpublished) (*citing* Watkins, 350 F.3d at 1300-01).

> . . . an ALJ is not free to simply disregard the [treating physician's] opinion or pick and choose which portions to adopt. Instead, the ALJ must proceed to a second determination, where the ALJ must both (1) weigh the opinion 'using all the factors provided . . .' and (2) 'give good reasons in the notice of determination or decision for the weight [the ALJ] ultimately assigns the opinion.'
>
> . . . [T]he regulatory factors are: (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship . . .; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the [pertinent] area . . . ; and (6) other factors . . . .
>
> Although the ALJ's decision need not include an *explicit discussion* of each factor, . . . , the record must reflect that the ALJ *considered* every factor in the weight calculation.

Andersen, 319 F. App'x at 718 (internal citations omitted) (emphasis in original).

Carpenter argued that the ALJ committed legal error when she failed to give controlling weight to Dr. Saltzman's opinions. Carpenter asserted that Dr. Saltzman was his "treating orthopedic surgeon." [Doc. 17, p. 15.] According to Carpenter, the relevant period of adjudication was from April 15, 2005 to December 31, 2006. [Id.] As stated previously, the Court finds more

36

persuasive the Commissioner's unrebutted argument that the relevant time frame began on September 17, 2005, although it makes little difference for purposes of this analysis.

What is notable, however, is that between April or September 2005 and December 31, 2006, Carpenter saw Dr. Saltzman only once on March 20, 2006. [AR 28.] At that time, Dr. Saltzman had not seen Carpenter for well over two years.  Thus, it is questionable whether Dr. Saltzman qualified as Carpenter's treating physician based on factors related to length of treatment relationship and frequency of examination, as well as the nature and extent of the treatment relationship.  However, for purposes of the motion to remand, the Court assumes Dr. Saltzman was a treating physician even though the evidence is not strong.

Plaintiff primarily argued that Dr. Saltzman's March 6, 2006 medical assessments and opinion that Carpenter was not capable of any form of gainful employment were entitled to some weight rather than "no evidentiary weight." [Doc. 17, pp. 16-17.] Plaintiff contended that the ALJ's rejection of Dr. Saltzman's opinion was summary, unsupported, and contradicted by the medical evidence of record.  Plaintiff further asserted this approach impermissibly placed the ALJ in the position of judging a medical professional and of substituting her lay opinion for that of a medical professional.

Essentially, Plaintiff claimed that the ALJ did not sufficiently explain the weight or lack of weight assigned to Dr. Saltzman's medical opinions.  The Court disagrees. The ALJ did not just disregard Dr. Saltzman's opinions, reports, and records in their entirety, without discussion or explanation.  She thoroughly discussed Dr. Saltzman's treatment and examination of Carpenter, along with Dr. Blevins' treatment and examination of Carpenter. [AR 45-47.] After evaluating these medical records, the ALJ stated she afforded Dr. Blevins' reports and opinions full evidentiary

weight but that she gave "less weight" to Dr. Saltzman's reports and opinions because they were not consistent with the record. [AR 47.]

In so determining, the ALJ observed the frequency of treatment by Dr. Saltzman (between Feb. and Sept. 2003, Carpenter received no treatment for alleged spinal disorders and no records show a history of cervical "advanced degenerative arthritic changes"). [AR 47.] Dr. Blevins' records from 2003 indicated Carpenter's range of motion was good despite complaints of neck pain. [AR 47.] Dr. Blevins further recommended Carpenter see Dr. Saltzman for evaluation of his neck complaints and yet, years went by before Carpenter was again seen by Dr. Saltzman.

The ALJ considered records in 2005 that showed no treatment or pain medication for cervical pain despite Dr. Saltzman's assessments of severe impairments. No medical records indicated Dr. Saltzman prescribed regular pain medications or referred Carpenter for pain management. [AR 47.] The ALJ further observed significant contradictions between Dr. Blevins' treatment records and those of Dr. Saltzman. [AR 47.] Dr. Blevins' records and opinions were supported by physical therapy records, Dr. Garard's medical records and treatment of Carpenter, and the opinions of the state agency's non-examining medical expert. [AR 47.] The ALJ summarized her assessment of Dr. Saltzman's records by stating for all of the above-stated reasons [AR 47], she afforded less weight to Dr. Saltzman's opinion than to other medical opinions of record.

The ALJ specifically proceeded to examine Dr. Saltzman's examination of Carpenter in 2006. [AR 48.] She noted Dr. Saltzman's severe assessments and multiple diagnoses in 2006 (after not seeing Carpenter for over two years) and his reliance on xrays that were not part of the record. She described Dr. Saltzman's review of Carpenter's problems and observed that such problems were not documented elsewhere in the record. [AR 48.]

38

The ALJ gave no evidentiary weight to Dr. Saltzman's opinion as to the ultimate question of disability. [AR 48.] This was appropriate.  Judgments by medical providers that go beyond purely medical findings to reach "issues reserved to the Commissioner" such as the ultimate question of disability are not medical opinions.   20 C.F.R. §§ 404.1527(a)(2), 404.1527(e).

> The agency "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 404.1527(e)(3); see Soc. Sec. Ruling (SSR) 96-5p, 1996 WL 374183, at *2 (July 2, 1996). Even the opinions of treating physicians "are never entitled to controlling weight or special significance" on such issues. SSR 96-5p, 1996 WL 374183, at *2; see SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996) (noting that for treating source opinion to be entitled to controlling weight, it "must be a 'medical opinion' " as defined "[u]nder 20 CFR 404.1527(a)").

Lackey v. Barnhart, 127 F. App'x 455, 457-58 (10th Cir. Apr. 5, 2005) (unpublished) (remanding in part because ALJ failed to mention treating doctor or his records "at all").  Here, the ALJ was not required to give any weight to Dr. Saltzman's opinion as to the ultimate issue of disability because that question is reserved to the Commissioner.  See Castellano v. Sec'y of Health & Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994) (treating physician may opine as to question of disability but "[t]hat opinion is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]").

The ALJ further explained that Dr. Saltzman's 2006 report cited medical conditions that were not verified and instead, were contradicted by the record.  Moreover, she observed that Carpenter's medical conditions as listed by Saltzman were not supported by objective evidence and that Dr. Saltzman did not properly apply a standard for disability in accordance with the Social Security Act and regulations. [AR 48.] As examples of additional problems with Dr. Saltzman's opinions, the ALJ noted his assessments about Carpenter's vision limitations that were not supported by the record.  His eye surgeries were successful based on the medical evidence of record.  In

addition, the ALJ discussed Dr. Saltzman's opinion that Carpenter had an extreme psychological impairment in 2008, even though such diagnosis was not supported by the medical records or medical treatment.

The ALJ also analyzed the weight she afforded Dr. Saltzman's hearing testimony concluding it was entitled to "limited weight." [AR 48.] The ALJ again thoroughly explained the specific reasons she afforded his testimony limited weight, including his vague response to questions, his failure to answer a question, and his inability to shed any light on some of his opinions. [AR 48.] The ALJ further observed that Dr. Saltzman admitted he had done no testing or functional capacity assessment of Carpenter in 2006, 2007 or 2008.

The Court finds that the ALJ articulated specific and legitimate reasons for affording the weight she did to Dr. Saltzman's various opinions and testimony. She correctly observed that many of Dr. Saltzman's diagnoses or assessments were not supported by clinical, medical, or radiological evidence of record or by other medical providers' records and treatment of Carpenter. *See, e.g.,* Dellinger, 298 F. Supp. 2d at 1139 ("ALJ certainly is entitled to question [doctor's] credibility and assessment when it was rendered more than eighteen months after any recorded visit with the patient . . . .").

The same is true here. Dr. Saltzman's opinions as to ultimate questions of disability, reserved to the Commissioner, as well as the multiple severe impairments Dr. Saltzman assessed Carpenter with in 2006, were provided more than 24 months after Dr. Saltzman last saw Carpenter in late 2003. Dr. Saltzman's treatment of Carpenter in the relevant adjudicatory period can only be characterized as sporadic or isolated. The ALJ's discussion of Carpenter's treatment identified this very problem. For all of the above-stated reasons, the Court concludes that substantial evidence supports the ALJ's evaluation of the medical opinions at issue, that she properly explained the

weight she assigned to medical opinions, that she considered all of the factors in the weight calculation, and that she committed no error.

## VII.    **RECOMMENDATION**

For all of the reasons described *supra*, the Court recommends that Carpenter's Motion to Reverse or Remand be DENIED and that this matter be DISMISSED, with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge